# EXHIBIT A(10)

| 1. DEPARTMENT REPORTING | CONTINUATION | 2. DEPARTMENT FILE NO. 86-1560 | |
|---|---|---|---|
| 3. DATE OF THIS REPORT 10/05/86 | SUSPECTS STOLEN PROPERTY PERSONS WANTED - ARRESTED - VICTIM - WITNESS | PAGE 2 | OF 5 |
| 5. VICTIM OR COMPLAINANT | | 6. PLACE OF OCCURRENCE | |

I received a radio call regarding a child being accidently strangled at 76▮▮▮▮▮▮▮▮▮▮e, the R▮▮▮▮▮▮▮▮esidence. After arriving at the house I contacted ▮▮▮▮▮▮▮▮ an upstairs bedroom. As I entered the bedroom where ▮▮▮▮▮▮▮ located, I saw a W/M, later identified as the deceased, lying on the bed in the master bedroom and ▮▮▮▮▮▮▮as attempting to administer CPR to the deceased; ▮▮▮▮▮▮▮▮▮▮ I immediately removed the child from the bed and placed him on the floor, continuing CPR. I was assisted by Paramedic R▮▮▮▮▮▮▮ of the ▮▮▮▮▮▮▮ Department. L▮▮▮▮ Ambulance 386 and ▮▮▮▮▮Pumper ▮▮▮ responded and arrived on the scene. The condition of the body was cold to the touch and there were no vital signs located. No heart beat could be located and he was not breathing. The tongue was discolored and swollen, protruding from the mouth slightly. The pupils were dilated and fixed. Ladue Paramedics ▮▮▮▮▮▮ and ▮▮▮▮▮ continued the CPR and also contacted ▮▮▮▮▮▮▮▮ of the S▮▮▮▮▮ Hospital Emergency Staff by radio and relayed all the above information. ▮▮▮▮▮▮▮ after reviewing the information, advised the Paramedics to contact the Medical Examiner's Office. J▮▮▮▮▮▮ of the Medical Examiner's Office was contacted by phone by Sgt. ▮▮▮▮▮▮▮ and responded to the scene.

0041795

| | | |
|---|---|---|
| LADUE P.D. | CONTINUATION | 86-1560 |
| 10/05/86 | | 3 of 5 |

▓▓▓▓▓ was recontacted by me and told all of the circumstances and the procedure that would happen. He said that he understood and gave the following account. He said that at approximately 1400 hours his wife, MARY, put the deceased down for a nap in his crib. The crib is located in his bedroom against the west wall. She then left and went shopping, leaving him ▓▓▓▓▓ ▓▓▓▓▓NK (deceased's grandfather) and deceased's older brother, ▓▓▓▓▓., age 7 at the house. He ▓▓▓▓▓) said that at approximately 1700 hours, he went upstairs to change his clothes, as he walked by ▓▓▓▓▓ room, he looked in and saw ▓▓▓▓H standing in the southwest corner of the crib. He said that it appeared that ▓▓▓▓▓ was looking out the window as the window blind was blocking ▓▓▓▓▓'S view of the upper body. The body was between the shade and the window. He approached ▓▓▓▓▓ and noticed he was not moving or making any noises. He said that ▓▓▓▓▓ always looks out of his window as he enjoyed the view. As he approached ▓▓▓▓▓ he saw the nylon cord around his neck and freed him immediately. He noticed the low body temperature immediately and took him into the master bedroom. He called this department immediately and all of the Ladue Units were dispatched and responded. MR ▓▓▓▓▓ said he attempted CPR and was doing that when I arrived.

0041796

| | CONTINUATION | DEPARTMENT FILE 86-1560 |
|---|---|---|
| DATE OF THIS REPORT 10/05/86 | DETAILS STOLEN PROPERTY PERSONS WANTED - ARRESTED - VICTIM - WITNESS | PAGE 4 OF 5 PAGES |
| VICTIM OR COMPLAINANT | PLACE OF | |

The medical examiner ███ responded and was advised of all the facts. He conducted his investigation and took photographs and his own measurements of the scene. His preliminary investigation revealed that the cause of death was by strangulation. The body was transported by ███ of ███ transport service at the request of ███. Prior to this, photographs were taken by ███ ███ of this department and the film was packaged as evidence. It will be turned over to this department's evidence officer and developed in the usual manner.

My investigation at the scene revealed that the southwest corner of the crib was located two (2) inches from the window sill. The 1/8 inch nylon cord found around the baby's neck by the father was located seven (7) inches from that same corner of the crib. There was vomit on the window sill directly below the nylon cord. This measured approximately five (5) inches from the corner of the crib. The crib itself measured 53 inches long and 30 inches wide. The crib was 38 1/2 inches tall. It was approximately 24 inches from the mattress to the top of the crib. The room is one of three bedrooms located on the second floor of the two story house. The room is in the southwest corner of the house.

| | CONTINUATION | DEPARTMENT FILE NO. 86-1560 |
|---|---|---|
| DATE OF THIS REPORT 10/05/86 | DETAILS STOLEN PROPERTY PERSONS WANTED - ARRESTED - VICTIM - WITNESS | PAGE 5 OF 5 PAGES |
| VICTIM OR COMPLAINANT | | |

I contacted ▓▓▓▓, the grandfather of the deceased. He said that he didn't know anything was wrong at the house until the police arrived. This was verified by ▓▓▓▓, who said that he didn't tell anyone about his discovery because he knew the boy was dead and he did not want his wife to get upset.

The people at the house at the time the boy was found was the father, ▓▓▓▓, the mother ▓▓▓▓, and the brother, ▓▓▓▓ Jr., and the grandfather ▓▓▓▓. All individuals, except the father, did not know the situation had occurred until police arrival. ▓▓▓▓'s brother ▓▓▓▓ and sister ▓▓▓▓ and her two children had arrived at the house for dinner just prior to police arrival but never went upstairs. Another friend of the family ▓▓▓▓, arrived at the scene at the same time the police arrived on the scene.

1201r

but pushed away by Father in grabbing victim & freeing him



0041799

Case No.: 86-2475

████████ County Medical Examiner

Pathologist: ████████

Name of Deceased: ████████
Address: ████████
Date and Time of Medical Examiner Notification: 10/06/86//05:14 PM
Date and Time of Pathologist's Examination: 10/06/86//08:00 AM
Date and Time Last Seen Alive: 10/05/86//02:00 PM
Date and Time Found: 10/05/86//05:00 PM
Race: White
Sex: Male
Age: 20 months
Date of Birth: 02/07/85
Occupation: Child/Student (1)
Marital Status: Never Married
History Suggests Death by: Accident
Death Certificate Signed by: S████████ Medical Examiner
Investigator: L████████
Police Agency: Police Agency Unknown



History: The history is that this child was found suspended by the neck, by the cord from a window hanging. He was dead at the scene.

External Examination: The body is that of a well developed, white male child, who appears approximately his stated age of 20 months. Clothing on the body includes a blue jumper, red, blue and gray striped shirt, white socks and a disposable diaper. The body is clean and well cared for, and shows a good state of nutrition. The head is covered with blond hair. There are no marks or lesions within the scalp. The eyes show clear sclerae and conjunctivae. The irises are blue. The pupils are round and regular. The nose and ears are not remarkable. The mouth contains deciduous teeth, appropriate for age. The mucous membranes are pale and moist. Injuries about the neck will be subsequently described. The chest is of usual contour and free of lesions. The abdomen is slightly protuberant and free of lesions. The extremities are well developed and free of deformity. The body measures 34 inches in length, and weighs approximately 30 pounds. There is 4+ rigor mortis, and there is fixed livor mortis over the posterior surface of the body.

Injuries: There is a ligature mark measuring 4 mm. wide, which is light brown in color, and just slightly depressed, which centrally, over the anterior portion of the neck, is located just above the thyroid cartilage, and rises slightly on the right lateral aspect of the neck, and on the left lateral aspect of the neck it rises rather sharply and is slightly deeper indented on the left side, and can be seen producing an impression all the way to the left occipital area, which appears to have been the point of suspension.

— 1 —

EX 3

0041800



Case No.: 86-2435

y Medical Examiner

In the midforehead, just to the right of the midline, there are three small, pale blue bruises, each less than 1 cm. in diameter.

Body Cavities: On removal of the chest plate, the organs are in normal position. The pleural cavities are free of fluid or adhesions. The pericardial sac is thin and contains no fluid. The bones of the rib cage and spine are intact.

Abdomen: The wall contains less than 1 cm. of fat and muscle. The organs are in their normal positions. There are no adhesions or fluid.

Heart: The heart weighs 60 gm. The chambers contain liquid blood, and there are no congenital malformations. The valves are of normal size and in good functional condition. The ventricles are of normal dimensions. The myocardium is free of lesions. The coronary arteries are of normal size and distribution, and free of anomaly. The aorta is of normal size and contour and free of lesions. The vena cava and tributaries are not remarkable.

Lungs: The larynx and trachea are intact. The surrounding musculature and vessels disclose no areas of hemorrhage or other abnormality. The lumen of the airway contains no foreign objects of material. The right lung weighs 110 and the left lung 120 gm. The pleural surfaces are pinkish-tan and smooth. On cut section, there is slight congestion and edema. The pulmonary arteries are free of thrombi. The bronchial tree is clean.

Liver: The liver weighs 480 gm. It is reddish-brown with a smooth surface. On cut section, there is a normal architecture.

Biliary Tract: The gallbladder is present and contains 1 ml. of brown bile. There are no stones present. The mucosa is intact, and the duct is patent.

Pancreas: The pancreas is of normal dimensions. It is pale pink with the usual consistency and lobulation. The duct is patent.

Gastrointestinal Tract: The esophagus is of usual contour. The mucosa is intact. The stomach is filled with a rather large amount of recently ingested food, some of which is recognizable as lima beans. The mucosa is intact. The large and small bowel contain the usual fecal material. The appendix is present.

Spleen: The spleen weighs 40 gm. It is dark blue with a smooth surface. On cut section, there is a well preserved red and white pulp.

Adrenals: The adrenals each weigh 1 gm. They have a normal color and thickness of cortex and medulla.

- 2 -

0041801



Case No.: 86-2475

████████ County Medical Examiner

Kidneys: The right kidney weighs 50 and the left kidney 40 gm. The capsules are thin and easily stripped off. The surfaces are bluish-tan and smooth. On cut section, the cortex and medulla are of normal thickness. The ureters and vessels are patent.

Cranial Cavity: The inner surface of the scalp shows a small subgaleal hemorrhage, which is somewhat reddish-brown in color, located in the right forehead, measuring 1 cm. in diameter. The calvarium is intact. On removal of calvarium, the inner and outer surfaces of dura are not remarkable. On removal of the brain, the cranial fossa and dural sinuses are intact.

Brain: The unfixed brain weighs 1200 gm. The cerebral hemispheres are symmetrical. The gyri are flattened, and the sulci narrowed, but the gyri are of usual distribution and consistency and show a normal pattern of development. The leptomeninges are thin, delicate and transparent. The vessels at the base of the brain are of normal size and distribution and free of anomaly. The external appearance of brainstem and cerebellum is not remarkable. Coronal sections of the cerebral hemispheres disclose no focal lesions. The ventricles are slightly compressed, but of normal outline and contour, and are symmetrical. Transverse sections of brainstem, and sagittal sections of cerebellum disclose no lesions.

- 5 -

 Case No.: 86-2435

███████ Medical Examiner

Findings:

I.   Hanging.

   A.   Ligature abrasion around neck.

II.  Contusions, midforehead.

III. Small subgaleal hemorrhages, right frontal.

███████
Deputy Medical Examiner

- 4 -

0041803



Case No.: 86-2435

County Medical Examiner

Data for Death Certificate:

Cause of Death:

    Part I
       Immediate Cause: Hanging
       Due to, or as a consequence of (b):
       Due to, or as a consequence of (c):

    Part II
       Other Significant Conditions:

Manner of Death: Accident

Toxicology Notes:

Blood: Ethanol -- None detected

ICD Code: (E913.9) Accidental mechanical suffocation: Other specified means



M.D.
Deputy Medical Examiner

- 5 -

Printed: 10/9/95 at 02:37 PM

0041804




THE ███████████NERSHIP
ATTORNEYS AT LAW

September 5, 1990

The Office of Stan Morrow
Project Manager
New Project Identification
Office of Program Management
U.S. Consumer Product Safety
  Commission
Washington, DC 20207

Dear Mr. Morrow:

   As you may or may not be aware, I am an attorney that represented a family whose 18 month old son was killed on October 5, 1986, when he was accidently entangled in a cord on the back of a woven wood shade. My client's lawsuit was just recently settled.

   I am writing at this time to urge you and your staff to expand your efforts in warning the general public about the dangers posed by cords on window coverings. I realize that the members of your staff helped initiate warnings regarding pull cords in the past two years. These efforts are commendable, but I am afraid they don't go quite far enough. In fact, limiting warnings to "pull cords" may be misleading.

   In the particular case that I handled, the parents were aware of the danger of pull cords and, in fact, placed the crib at the opposite end of the window from where the pull cord was located. The window shade was 8 feet long, and so the child's crib was approximately 7 feet away from the pull cord. The child became entangled in what was referred to as a "support cord" on the back of the woven shade. His crib overlapped the shade by only several inches, but he got behind the shade to look out the corner of the window and became entangled and was unable to free himself. His parents found him at the end of his nap.

Ex 4

0041805

Page 2
September 5, 1990

This "support cord" was an even more insidious danger than the "pull cords" because the support cord was hidden from view. The cord did not even show from the front, when the shade was rolled up because the shade flapped up in such a way that the cords were invisible.

In my opinion, as well as the opinion of the expert safety analyst that consulted with me in this case, limiting warnings to simply the "pull cord" is insufficient because parents will be mislead into thinking that the pull cord is the only danger on a window covering when, in fact, all cords on window coverings are potential strangulation hazards to young children. During our investigation of this particular case, we learned that the cording on many models of venetian blinds and mini blinds can be pulled out away from the blinds to form a noose-like strangulation hazard, even though the cording is threaded to each individual slat. This can occur when the blinds are in the completely lowered position because in some models, there is no tension on the cording when it is in that position.

It would seem a simple matter to re-word the existing warnings on the Consumer Alert to include "cording on all window shades or drapes, including cording on the back and cording running through the slats". Our safety analyst believes that this type of warning should be included in the installation instructions with the diagram, as well as on hanging tags attached to pull cords, cording on the back and threaded cording through slats. He also feels that a permanent label should be affixed to the headrail on each product.

I hope you will discuss these issues with your staff and recommend that they take action immediately.

I would appreciate any comments you care to make in response to this letter.

Very truly yours,

[signature redacted]

TG/ldr
CERTIFIED RETURN
RECEIPT REQUESTED

0041806

# Suit in Tot's Death May Prevent Others

By Tim Bryant

[illegible] months and [illegible]

At 5 p.m. on Oct. 5, 1986, [redacted] found the little boy dead in his crib, which was next to a window. A cord of a window shade was wrapped around [redacted] neck.

A wrongful death suit filed two years later by [redacted]'s parents against the shade's manufacturer was settled out of court this week in a manner that the couple's attorney says is unique.

"It's a settlement in your heart you feel good about," said the lawyer, [redacted], who represented [redacted] and [redacted]. The [redacted] manufacturer, [redacted] doing business as Beautiful [redacted] Coverings Inc.

Under [illegible] of the settlement, [redacted] office will send a notice to the nation's 350 largest newspapers, [redacted] said. The notice will warn consumers about the hazards of cords on window coverings, even if the cords are on the back of the shades.

The company will also write the federal Consumer Product Safety Commission, urging the commission to tell the public about the hazards of such cords. And the company will

See TOT, Page 10

IDI# 900816HCN2237

G08 0079

## Tot

From page one

change in [illegible] ding in information that accompanies its window products to include a statement about the cords, [redacted] said.

In addition, the [redacted] will get $100,000, the lawyer said.

Attorneys for Beatrice were unavailable for comment Wednesday.

At the time [redacted] died, he was supposed to have been taking his afternoon nap. But authorities believe [redacted] was looking out the window, got tangled up in the shade's cord and was unable to free himself. An autopsy showed that he had suffocated.

The [redacted] filed suit, alleging that the design of the shade could allow a child to become caught in the cords and that the shade lacked a label that adequately warned of the hazard.

The settlement was reached this week as the case was set to go to trial in U.S. District Court.

The [redacted] issued a prepared statement through their attorney, [redacted]. It said: "Our whole objective in filing this lawsuit was [illegible] parents [illegible] known dangers of placing [illegible] near a [illegible] with any [illegible] covering. C[illegible] would [illegible]

They said they would use the money from the settlement to form a foundation for parents.

"The foundation would be focusing on safety matters concerning children," the [redacted] said.

"Nothing can bring [redacted] back," they said. "But we might be able to save some other babies' lives. It was unfortunate that we had to go through the stress and pain of a lawsuit to get done what the Consumer Product Safety Commission should have done in the first place."

[redacted] is a lawyer. Her husband is a professor at [redacted]. The couple have a 12-year-old son.

[redacted] said the [redacted] were emotionally drained but believed that "if they can just prevent one more death, they can feel like [redacted] death is worth something, at least."

As part of the settlement, the [redacted] and their safety expert will be allowed to help draw up the notice to be sent to newspapers, said [redacted], adding that she was pleased with the way the agreement had been reached.

[redacted] wants to see children to get [illegible], she said. "This was a hard, hard [illegible] for everyone involved, even for the defendant.

"Something is going to get done. The industry is going to change because of [illegible]. I think everyone involved feels good about that."

0041807





EX 1

Views of shade in place & partially raised. Shade pleats horizontally from bottom as it is raised

0041808

9008 16 HCN 2237



view of cord along back of shade



Police photo of back of shade & cord taken just after accident.

0041809



photo depicting cord being pulled away from back of shade



Police Photo of crib in place at edge of window

0041810